IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 9, 2019

## FABIAN CLAXTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 07-06442     Chris Craft, Judge

————————————————————

### No. W2018-00618-CCA-R3-ECN

————————————————————

The petitioner, Fabian Claxton, appeals the denial of his petition for writ of error coram nobis by the Shelby County Criminal Court, arguing the trial court erred in dismissing the petition because newly discovered evidence exists in his case. After our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Terrell L. Tooten, Cordova, Tennessee, for the appellant, Fabian Claxton.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

On May 22, 2007, the petitioner approached Riverview Park in Memphis, Tennessee and fired multiple shots in an attempt to shoot Jeremy Gray. Though the petitioner did not injure Mr. Gray, he did injure three innocent bystanders. For his actions, a jury convicted the petitioner of four counts of attempted first degree murder and unlawful possession of a handgun while in a public place. *State v. Fabian Claxton*, No. W2009-01679-CCA-R3-CD, 2011 WL 807459, at *1 (Tenn. Crim. App. Mar. 7, 2011), *no perm. app. filed*. The trial court sentenced him to an effective eighty-eight

years' incarceration. *Id.* This Court upheld the petitioner's convictions and sentence on appeal. *Id.* at *4-10. In doing so, we summarized the proof presented at trial, as follows:

On May 22, 2007, the [petitioner], wearing a blue bandana that covered the lower part of his face, approached the Riverview Park at the Riverview Community Center in Memphis, Tennessee and fired a .40 caliber revolver into the air. After firing into the air, the [petitioner] began shooting toward the basketball court with a semi-automatic handgun and the .40 caliber revolver, injuring three teenagers, Demarcus Fleming, Blessing Pollard, and Frederick Buford, who had attempted to run away when the [petitioner] began shooting. There were several other teenagers and children sitting near and playing on the basketball court that also ran but were not injured by the [petitioner].

In the investigation that followed, Investigator Jeffrey Garey of the Memphis Police Department found four Winchester .40 Smith & Wesson bullet shell casings and six .25 automatic bullet shell casings near where the [petitioner] had been reportedly standing as he shot toward the basketball court. When the [petitioner] was apprehended the next day, Officer John Gorley of the Memphis Police Department found a small handgun and a purse in the [petitioner's] vehicle. In the purse, officers found a box of Remington .25 caliber ammunition and a blue bandana. The handgun was a 6.32 millimeter handgun, which is equivalent to a .25 caliber handgun and can fire .25 caliber ammunition. Officer Gorley did not find a carrying permit for the weapon even though a permit is required when possessing a weapon upon a public road "in the fashion that that gun was being transported."

Once at the police station, the [petitioner] waived his *Miranda* rights and confessed to his involvement in the shooting. Detective Robert Wilkie of the Memphis Police Department transcribed the [petitioner's] statement, which was signed by the [petitioner]. In his statement, the [petitioner] admitted that he and Antonio Malone were responsible for shooting Frederick Buford, Blessing Polard, and Demarcus Fleming. He stated that he was intending to shoot Jeremy Gray. According to him, there were only two people, Jeremy Gray and a person named A.J., on the basketball court when he began shooting. He was on the "top of the hill for the first shots," and he was "by the bridge" for the "second shots."

In his statement, the [petitioner] said that prior to the shooting, Antonio Malone had talked to Jeremy Gray, who told Antonio Malone that

he believed that the [petitioner] and Antonio Malone had shot "some dope boy" and that he was looking for them and that "some GD's were looking" for Antonio Malone. When the [petitioner] told Antonio Malone that he wanted to "confront" Jeremy Gray about the situation, Antonio Malone told the [petitioner] that Jeremy Gray "had a gun on him." The [petitioner] said that when they approached the park, Antonio Malone had the .40 caliber revolver while he had the .25 semi-automatic. The [petitioner] told Antonio Malone that he would not shoot toward the basketball court because "there were too many kids." They eventually decided that Antonio Malone would "fire a couple of shots to scare the little kids off." After Antonio Malone "shot a couple of times down there," the [petitioner] took back the gun and "shot the rest of the shots out of the gun" and "shot the [.25 semi-automatic] in the air until it was empty." The [petitioner] stood on the bridge for 15 or 20 seconds and after seeing that there "wasn't no kids out there laying or screaming," he "ran back to the car" and gave the .40 caliber revolver back to Antonio Malone. Upon further questioning, the [petitioner] told Detective Wilkie that he shot the .25 caliber semi-automatic into the air but that he "shot at Jeremy with the [.40 caliber revolver]."

At trial, Ortanio Sharp, who was 15 years old at the time of the trial and in [the] State's custody for unrelated charges, testified that he observed Antonio Malone and Jeremy Gray talking on May 22, 2007, sometime before the shooting. He believed that Jeremy Gray had confronted Antonio Malone, and he heard Antonio Malone say that he was going to find the [petitioner]. After observing the two talking, he went to his boss's house for approximately 15 minutes before returning to the park.

Once he arrived back at the park but before he stepped onto the basketball court, he heard people say, "[T]here go Fay." He turned around and saw whom he believed to be the [petitioner] fire a revolver into the air before firing toward Jeremy Gray, who was standing on the basketball court. The [petitioner] had a "black rag across his face" and was "wearing a hoodie over his head" while standing on a bridge that was near the basketball court. After seeing the [petitioner] fire the first shot into the air, Ortanio Sharp saw the [petitioner] lower his weapon before firing more shots. As Ortanio Sharp was running away, he heard gunshots coming from a semi-automatic weapon. He returned to the basketball court when he heard Blessing Pollard screaming. He admitted that he was unable to positively identify the [petitioner] as the shooter but stated that the shooter looked like the [petitioner] and that he had heard that others had identified

the [petitioner] as the shooter. He stated that there were "about" 21 kids in the area when the shooting occurred.

Demarcus Fleming, who was 15 at the time of the trial but 14 at the time of the shooting, testified that on May 22, 2007, he was sitting on a bench with his 12-year-old sister, Cashondra Fleming; his 12-year-old friend, Demetrius; and Blessing Pollard. He was at the park watching "A.J." and Jeremy Gray play basketball for approximately ten minutes when he heard gunshots. He turned toward the sound of the gunshots and saw a "dark skin dude with a [bandana] over his face." The man "had two guns in his hands" and was pointing the weapons toward the basketball court. He ran toward the railroad tracks with Cashondra Fleming and Demetrius. Blessing Pollard tried to run with them but fell on the ground. After approximately ten minutes, Demarcus Fleming stopped and realized that he had been shot in the back of his left leg and that Fredrick Buford had been shot. They returned to the basketball court to find that Blessing Pollard had also been shot and was "losing a lot of blood."

Blessing Pollard, who was 16 at the time of trial and in the State's custody for unrelated charges, testified that she was at Riverview Park sitting on a bench with Demarcus Fleming and others on May 22, 2007. They were watching Jeremy Gray and others play basketball when she noticed Jeremy Gray looking up. She turned around and saw a person with two guns in his hands. The person was aiming the guns toward Jeremy Gray. She could not remember how many times the person fired the weapons. She could not identify the shooter, but she stated that the shooter was wearing a "scarf on his mouth" and that there was only one shooter. She stated that she was shot in the back of her right calf.

Frederick Buford, who was 16 at the time of trial, testified that on May 22, 2007, he was at the Riverview Park playing basketball with Jeremy Gray, Demarcus Fleming, A.J., and others. As they were playing, he heard gunshots. He stated that when he heard gunshots and saw everybody running, he ran toward the railroad tracks. He eventually realized that he had been shot in the upper back; the bullet ended up in his neck. He could not identify the shooter.

Jeremy Gray, who was 17 at the time of trial and in [the] State's custody for unrelated charges, testified that he went to the Riverview park with Aven Farrow to play basketball on May 22, 2007. He stated that he had a 10 or 15-minute conversation with Antonio Malone "right before" he

started playing basketball.  He stated that Antonio Malone asked him about "Clavin and Fay."  He stated that approximately three weeks prior to May 22, 2007, he and the [petitioner] had a dispute at the Crystal Palace skating rink about the [petitioner] "shooting in the neighborhood."  However, he stated that this dispute was not the topic of the discussion that he had with Antonio Malone on May 22, 2007.

Mr. Gray testified that on May 22, 2007, he was not armed while he was playing basketball.  He said that while he was on the basketball court, he saw a person wearing a blue bandana around his mouth standing on the bridge near the basketball court and that he believed that this person was the [petitioner] because the [petitioner] "was the only problem [he] had in the neighborhood."  Jeremy Gray further stated that he recognized how the [petitioner] walked and "how his body shaped up."  He said that he ran when the [petitioner] raised a handgun and pointed it toward him.  He said that as he was running, he heard "different shots come from different guns" and that he heard eight or nine gunshots before he stopped running.  When he returned to the basketball court, he called 9-1-1 with his cellular telephone because he saw that a little girl had been shot.

The [petitioner], who was 20 at the time of trial but 19 on May 22, 2007, testified at trial that he went to the park to talk with Jeremy Gray.  He said that as he was walking over the bridge to the basketball court, he called out to Jeremy Gray, waving and raising his hand to get his attention. When he saw Jeremy Gray reaching for what he believed was a weapon hidden under a t-shirt, he began shooting with a .40 caliber revolver that Antonio Malone had handed him as they were walking toward the park.  He admitted that he also used a .25 that he had bought from Antonio Malone. He said that he brought weapons with him because Antonio Malone had told him that Jeremy Gray was armed and wanted to kill him.  He said that he was carrying the weapons because he feared for his life.

The [petitioner] stated that he was wearing a white shirt and a black hat that was "turned to the back" and that he did not have anything covering his face.  He stated that he did not mean for anyone to get hurt and that he only returned to his car after he scanned the area and found that nobody was yelling or screaming.  He admitted that he saw two or three people sitting on the bench beside the basketball court when he shot toward Jeremy Gray, but he stated that he did not see Blessing Pollard lying on the ground when he scanned the area.

Relative to his apprehension, he stated that he did not know that there was a bandana in the purse in his car. He stated that he asked his sister if he could borrow the purse to store the gun and the ammunition that Antonio Malone had given him. He admitted that he gave a statement at the police station that was contrary to his trial testimony, but he explained that his statement differed from his testimony because the detective was arguing with him and telling him what to say.

The [petitioner's] mother, Constance Claxton, testified at trial that Antonio Malone was not allowed to come to her house and that despite her instructions, Antonio Malone was at her house on May 22, 2007. She said that she told Antonio Malone to leave and that the [petitioner] left with Antonio Malone but returned 30 or 45 minutes later. The [petitioner's] friend, Oscar Brent, testified that he worked with the [petitioner] and that he believed the [petitioner] was a "reliable and trustworthy employee."

*Fabian Claxton*, 2011 WL 807459, at *1-4 (footnote omitted).

On November 19, 2015, nearly five years after the denial of his direct appeal, the petitioner filed a pro se petition for writ of error coram nobis.[1] In the petition, the petitioner alleged newly discovered evidence exists in his case in the form of "sworn testimony of the State's witness, Jeremy Gray, declaring that [Mr. Gray] was misled by detectives to believe that the crimes were committed by [the petitioner] and that [Mr. Gray] gave false testimony at trial because he was threatened and coerced to do so." The petitioner attached the "Affidavit of Jeremy Gray" to his petition which stated:

On May 22nd, 2007, I was a victim of a crime in Shelby County, Memphis, Tennessee, that was eligibly (sic) committed by [the petitioner]. During the investigation process, I was misled by detectives into believing that this crime was committed by [the petitioner] through deception. As the process continued I began to believe the events as truth. The case eventually went to trial and through coercion and threats I gave false testimony which resulted in a guilty verdict for [the petitioner]. I had a robbery and kidnapping charge pending and Judge Chris Craft, in division VIII, told me that if I didn't proceed with the prosecution of [the petitioner] and testify at his trial, he would make sure that I serve 100 percent on my pending cases. Through threats and coercion I gave false testimony and

---

[1]The petitioner simultaneously filed a pro se petition for post-conviction relief. After the appointment of counsel, however, he elected to pursue the petition for writ of error coram nobis before pursuing his post-conviction claims.

hereby recant all previous statements and testimony involved in the criminal charges brought against [the petitioner].

Mr. Gray served as the only witness at the evidentiary hearing on the petitioner's coram nobis claims. Mr. Gray stated he was seventeen years old when he testified at the petitioner's trial. At the time, Mr. Gray had charges pending against him. However, he believed he would get a reduction in the service of his sentences for the pending charges in exchange for his testimony against the petitioner. Specifically, Mr. Gray's attorney stated he was to receive "thirty (30%) percent on [his] time, but [he] didn't." Instead, after testifying against the petitioner, Mr. Gray served an eight-year sentence at 100%.

Mr. Gray then discussed the affidavit pertinent to the petitioner's present claims, asserting he provided the same to the petitioner's brother in 2015. According to Mr. Gray, he was not threatened or coerced into writing the affidavit. Rather, as noted in the above-detailed affidavit, Mr. Gray stated detectives and a trial judge coerced him into testifying against the petitioner at trial.

During cross-examination, Mr. Gray acknowledged the statement he provided to police on May 22, 2007, was similar to his preliminary hearing and trial testimony. Mr. Gray affirmed the details surrounding the shooting, including: Mr. Gray had a disagreement with the petitioner prior to the shooting; Mr. Gray spoke to Mr. Malone prior to the shooting; the petitioner wore a blue bandana, blue shorts, and a white t-shirt during the shooting; Mr. Gray believed the petitioner to be the shooter based on his stature, complexion, and gait; Mr. Gray believed the petitioner shot at him; and Mr. Gray identified Mr. Malone and the petitioner in photographic lineups after the shooting. After the State detailed the similarities between Mr. Gray's statement and his trial testimony, Mr. Gray ultimately affirmed the testimony he provided at the petitioner's trial was true. During re-direct, Mr. Gray again stated his attorney told him to testify against the petitioner in exchange for "a deal" on his pending cases, noting the jury was unaware of the deal.

Upon its review of the evidence presented, the coram nobis court entered a written order denying the petition. This timely appeal followed.

### *Analysis*

On appeal, the petitioner asserts the trial court erred in denying his petition for writ of error coram nobis because Mr. Gray admitted in his affidavit "that he did not give truthful testimony" at trial and "this information should be provided to the jury, so that they can test the credibility of Mr. Gray, when determining whether to accept or reject his testimony." The State disagrees and suggests "the coram nobis court properly noted that

[Mr. Gray] admitted at the evidentiary hearing that his trial testimony had been truthful" and "[Mr. Gray's] affidavit claiming that he had been forced to falsely implicate the petitioner was not credible." The State also contends ample evidence exists in the record to support the petitioner's convictions, including "that an additional eyewitness had identified the petitioner as the shooter, and the petitioner admitted to the police that he had fired the shots." Upon our review, we agree with the State.

The writ of error coram nobis in criminal cases is a statutory remedy limited to "errors *dehors* the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding." Tenn. Code Ann. § 40-26-105(b). To obtain relief, a petitioner must show he "was without fault in failing to present certain evidence at the proper time." *Id.* If successful, "a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." *Id.* "Our supreme court has stated the standard of review as 'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.'" *Kenneth Dale Sanders v. State,* No. M2016-00756-CCA-R3-ECN, 2017 WL 633784, at *2 (Tenn. Crim. App. Feb. 16, 2017) (citing *State v. Vasques*, 221 S.W.3d 514, 525-28 (Tenn. 2007)). More specifically, within the context of "newly discovered recanted testimony," a new trial is warranted when:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing *State v. Mixon*, 983 S.W.2d 661, 673 n.17 (Tenn. 1999)).

In this case, the petitioner's coram nobis claims rest on the fluctuating testimony of Mr. Gray in identifying the petitioner as the shooter. The petitioner suggests Mr. Gray's affidavit demonstrates his trial testimony was biased, a fact the jury should have known in weighing Mr. Gray's credibility at trial. The petitioner argues if the jury had known of Mr. Gray's bias, the outcome of his trial would have been different. We, however, disagree.

In denying relief to the petitioner, the coram nobis court stated:

As this court finds that the newly discovered evidence in this case, the recantation of [Mr. Gray's] identification of the petitioner as the shooter at trial, was itself recanted by [Mr. Gray] at the hearing on this petition, who admitted that he testified truthfully at trial, the petitioner is not deserving of relief. Furthermore, even had [Mr. Gray] testified at trial that he was not able to identify the petitioner as the shooter, the finding of the other evidence, such as the weapon and ammunition, the petitioner's identification by another witness as the shooter and the petitioner's confession to the police and admission at trial that he was in fact the shooter convinces this court that this evidence would not have resulted in a different judgment.

Our review of the issue presented reflects that of the coram nobis court. Nothing in the record supports the petitioner's claim that newly discovered evidence exists relating to Mr. Gray's testimony. Rather, the record shows Mr. Gray identified the petitioner as his shooter in a statement to police on May 22, 2007, the day the crimes were committed. At the petitioner's trial, Mr. Gray again identified the petitioner as the shooter. Years later, Mr. Gray recanted his trial testimony, claiming he was coerced into identifying the petitioner as the shooter by detectives and a trial court judge. Mr. Gray's change of position was documented in an affidavit dated July 31, 2015. However, at the February 9, 2018 hearing on the present coram nobis petition, Mr. Gray recanted the testimony within the affidavit. In doing so, Mr. Gray affirmed he testified truthfully at trial. Accordingly, any alleged newly discovered evidence has been recanted by Mr. Gray and the petitioner has failed to show how Mr. Gray's inconsistent testimony affected the outcome of his trial. The petitioner cannot meet his burden. *Kenneth Dale Sanders*, 2017 WL 633784, at *2; *Ratliff*, 71 S.W.3d at 298. Furthermore, as addressed by the coram nobis court, copious evidence exists in the record to support the petitioner's convictions, including the petitioner's own confession to police and at trial, and the proposed newly discovered evidence alleged by the petitioner in no way contradicts the overwhelming proof of the petitioner's guilt as established at trial.[2] The petitioner is not entitled to relief.

### *Conclusion*

---

[2]Separately, we note, the coram nobis court did not address the statute of limitations in regards to the petitioner's claims. The court stated: "This court need not decide the statute of limitation question, finding that the 'newly discovered evidence' would have made no difference in the verdict at trial." We agree. Based upon the above-outlined reasoning, it is unnecessary to address the applicability of equitable tolling in the petitioner's case as it is clear he is not entitled to relief.

Based upon the foregoing authorities and reasoning, the judgment of the coram nobis court is affirmed.

_____
J. ROSS DYER, JUDGE